# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

LOUISE GRUENTZEL, Individually and on Behalf of All Others Similarly Situated,

       Plaintiff,

v.

DYNAMIC RECOVERY SOLUTIONS, LLC, and CAVALRY SPV I, LLC,

       Defendants.

Case No.: 18-cv-13

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

## INTRODUCTION

1. This class action seeks redress for collection practices that violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA").

## JURISDICTION AND VENUE

2. The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 15 U.S.C. § 1692k and 28 U.S.C. §§ 1331 and 1337. Venue in this District is proper in that Defendants directed their collection efforts into the District.

## PARTIES

3. Plaintiff Louise Gruentzel is an individual who resides in the Eastern District of Wisconsin (Milwaukee County).

4. Plaintiff is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendants sought to collect from her a debt allegedly incurred for personal, family, or household purposes.

5. Defendant Dynamic Recovery Solutions, LLC ("DRS") is a debt collection agency with its principal offices located at 135 Interstate Blvd Ste 6, Greenville, South Carolina 29615.

6. DRS is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

7. DRS is engaged in the business of collecting debts owed to others and incurred for personal, family, or household purposes.

8. DRS is a debt collector as defined in 15 U.S.C. § 1692a.

9. Defendant Cavalry SPV I, LLC ("Cavalry") is a foreign limited liability company and debt collection agency with its principal place of business located 500 Summit Lake Dr, Suite 400, Valhalla, NY 10595-1340.

10. Cavalry is engaged in the business of collecting debts, in that it purchases and receives assignment of consumer debts that are in default at the time Cavalry acquires them.

11. The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

12. The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, *or* who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added); *see Barbato v. Greystone All., LLC*, Civil Action No. 3:13-2748, 2017 U.S. Dist. LEXIS 172984 (M.D. Pa. Oct. 19, 2017); *Tepper v. Amos Fin., LLC*, No. 15-cv-5834, 2017 U.S. Dist. LEXIS 127697 *20-22 (E.D. Pa. Aug. 9, 2017) ("the statute provides two possible paths for a plaintiff to prove that a particular defendant is a 'debt collector.' Subject to certain exceptions not relevant here, the defendant will be a debt collector if either (1) its 'principal

purpose . . . is the collection of any debts,' or (2) it 'regularly collects or attempts to collect . . . debts owed or due . . . another.'").

13. The primary purpose of Cavalry's business, and Cavalry's principal purpose, is the collection of consumer debts. Cavalry's website contains an "About Us" webpage, which states: "Founded in 2002, Cavalry is a leader in the acquisition and management of non-performing consumer loan portfolios." *See* http://www.cavalryportfolioservices.com/about.html.

14. Cavalry is engaged in the business of a collection agency, using the mails and telephone to collect defaulted consumer debts.

15. A company meeting the definition of a "debt collector" (here, Cavalry) is vicariously liable for the actions of a second company collecting debts on its behalf. *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325-26 (7th Cir. 2016) (assignees who are "debt collectors" are responsible for the actions of those collecting on their behalf); *citing Pollice*, 225 F.3d at 404-05.

16. Cavalry is a debt collector as defined in 15 U.S.C. § 1692a.

## FACTS

17. On or about January 10, 2017, DRS mailed a debt collection letter to Plaintiff regarding an alleged debt, allegedly owed to Cavalry and originally owed to "Capital One, N.A./BON TON/ELDER BEERMA" ("Capital One"). A copy of this letter is attached to this complaint as Exhibit A.

18. Upon information and belief, the alleged debt that DRS was attempting to collect was a credit card account, used only for personal, family, or household purposes.

19. Upon information and belief, Exhibit A is a form letter, generated by computer, and with the information specific to Plaintiff inserted by computer.

20. Upon information and belief, Exhibit A is a form debt collection letter used by DRS to attempt to collect alleged debts.

21. Upon information and belief, Exhibit A is the first written communication that DRS sent to Plaintiff regarding the alleged debt to which Exhibit A refers.

22. Exhibit A contains the following text:

> This is an attempt to collect a debt by a debt collector and any information obtained will be used for that purpose. Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice, that you dispute the validity of the debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. Upon your written request within 30 days after receipt of this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

23. The above language in Exhibit A is the debt validation notice that the FDCPA requires to be included with the initial written communication to the consumer, which discloses the statutorily mandated 30-day validation period. 15 U.S.C. § 1692g.

24. If Exhibit A was actually mailed on January 10, 2017, it would been received on or after January 13, 2017.

25. If Exhibit A was received on January 13, 2017, the consumer would have until February 12, 2017 to mail out a request for validation. *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516, 519 (7th Cir. 1997) (consumer triggers verification rights by mailing out written notice of dispute on thirtieth day after receiving validation notice).

26. Exhibit A also contains the following settlement offers:

① You may resolve your account for $426.03 if payment is received before February 18, 2017. We are not obligated to renew this offer. Upon receipt and clearance of your payment, this account will be considered satisfied and closed, and a satisfaction letter will be issued or;

② You may resolve your account for $464.76 in 2 payments starting on February 18, 2017. We are not obligated to renew this offer. Please make payments no more than 30 days apart. Upon receipt and clearance of these two payments of $232.38, this account will be considered satisfied and closed, and a satisfaction letter will be issued or;

③ You may resolve your account for $503.49 in 4 payments starting on February 18, 2017. We are not obligated to renew this offer. Please make payments no more than 30 days apart. Upon receipt and clearance of these four payments of $125.87, this account will be considered satisfied and closed, and a satisfaction letter will be issued or;

27. Each of the above offers requires that the consumer's payment be received by February 18, 2017. Exhibit A.

28. Any consumer, unsure whether a payment received after February 18, 2017 would actually settle the debt, would feel compelled to allow for an extra two or three days for mailing and DRS processing to ensure they were able to take advantage of the settlement offers in Exhibit A and that the payment would not be processed as a partial payment on the full balance.

29. Thus, any consumer who wished to take advantage of the settlement offers in Exhibit A would feel compelled to mail out payment on or before February 12, 2017.

30. The 30-day validation period identified in Exhibit A would end at or around the same time the consumer would feel compelled to mail out a payment to take advantage of the settlement offers in Exhibit A before they expire. *See* 15 U.S.C. § 1692g(a).

31. Assuming the consumer sought verification at or near the end of the statutorily mandated 30-day validation period, there would be no way for DRS to provide verification in time for the consumer to tender payment in acceptance.

32. The original creditor in this case has assigned the debt to Cavalry, a third-party debt buyer.

33. Third-party debt buyers are notorious for attempting to collect on debts that are outside the statute of limitations or otherwise cannot be verified. *See Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 446 (6th Cir. 2014) ("Debt buyers now pay billions of dollars to purchase tens of billions of dollars of consumer debt each year, most of it charged-off credit card debt like Stratton's. Debt buyers usually purchase bad debts in bulk portfolios, often in the form of a spreadsheet, and rarely obtain the underlying documents relating to the debt.") (citing Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* at ii-iii).

34. The unsophisticated consumer, never having dealt with Cavalry directly, might be confused as to whether Cavalry actually owned the debt or whether Cavalry could attempt to

5

collect on a debt that may have charged off years before Cavalry sent its letter. In fact, this is one of the primary purposes of the FDCPA and the reason the FDCPA affords the consumer these verification rights.

35. The unsophisticated consumer, having dealt directly with the original creditor, might know that the underlying debt was valid as long as Cavalry actually owned the debt and could attempt to collect it, in which case she would want to accept the settlement offer.

36. The unsophisticated consumer, realizing that the debt could not be verified before the settlement offer in Exhibit A expired, would be unsure how, or whether, she could seek verification of the debt but accept the settlement offer if the debt could be verified.

37. Exhibit A does not explain how, or even whether, a consumer may request verification of the debt and accept the settlement offer if the debt is verified.

38. The unsophisticated consumer, not interested in paying Cavalry unless it could actually attempt to collect the debt but wishing to take advantage of the settlement offer as Cavalry could attempt to collect the debt, might tender her payment to accept the settlement offer along with the notice of dispute.

39. The unsophisticated consumer would also not know whether or how she could receive her money back from Defendants if Defendants are unable to verify the debt or if the debt actually is not valid.

40. In fact, though the unsophisticated consumer would not realize it, the debt collector need not even verify the debt as long as it ceases further attempts to collect the debt. *See Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997).

41. Thus, the purpose and effect of providing a settlement offer with a letter containing the validation notice is to discourage the unsophisticated consumer from seeking verification.

42. Moreover, Option (3) in <u>Exhibit A</u> states:

> ③ You may resolve your account for $503.49 in 4 payments starting on February 18, 2017. We are not obligated to renew this offer. Please make payments no more than 30 days apart. Upon receipt and clearance of these four payments of $125.87, this account will be considered satisfied and closed, and a satisfaction letter will be issued or;

43. A consumer making four payments of $125.87 would have paid a total of $503.48, not $503.49.

44. The unsophisticated consumer could make four payments of $125.87 and would not know whether she had sent enough money to actually settle the account, due to the possibility that DRS, or Cavalry, actually required the consumer pay a total of $503.49 to settle the account.

45. The consequences of misleading a consumer with respect to settling a debt are much greater than misleading about the amount of the debt. A payment of the entire debt would leave pennies or, at most, a few dollars left over for payment later. *See eg. Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 876 (7th Cir. 2000). Because the offer contains a false and confusing payment schedule, the payments specified in Option (3) in <u>Exhibit A</u> may be insufficient to settle the whole debt. Due to the terms of Option (3), it is possible that DRS, or Cavalry, could continue to collect the entire remaining balance of the alleged debt – over $270.00 – plus additional interest, as a settlement has not actually been consummated.

*FDCPA Violations*

46. <u>Exhibit A</u> is confusing to the unsophisticated consumer because it demands a payment within the validation period or shortly thereafter, but do not explain how the validation

7

notice and settlement "deadline" fit together. *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) ("In the typical case, the letter both demands payment within thirty days and explains the consumer's right to demand verification within thirty days. These rights are not inconsistent, but by failing to explain how they fit together the letter confuses.").

47. Because the settlement offer in Exhibit A expires at or around the same time as the validation period, there is an apparent contradiction between the settlement offer and the validation notice.

48. The unsophisticated consumer would be confused about whether the settlement offer in Exhibit A would require her to forego her rights to validate the debt.

49. The plain language of Exhibit A is unclear as to how DRS would proceed in the event that the consumer mailed a dispute along with a payment that was intended to accept the settlement offer in the case that the debt could be verified.

50. Where a consumer mailed a dispute along with a payment that was intended to accept a settlement offer in Exhibit A, under the terms of Exhibit A, DRS might:

   a. Hold the payment in escrow pending verification of the debt;

   b. Interpret the payment as an accord and satisfaction and settlement in full that contractually bars the consumer from requesting verification of the debt; or

   c. Send the payment back to the consumer pending verification of the debt, in which case the consumer may no longer be able to settle the debt because the offer would have expired while the debt collector was obtaining verification.

51. Where a consumer mailed a dispute along with a payment that was intended to accept a settlement offer with an impending expiration date, whether the FDCPA requires a debt collector to proceed along any of the above paths is an open question in the Seventh Circuit. *See Bailey v. TRW Receivables Management Services, Inc.*, 1990 U.S. Dist. LEXIS 19638, *7-8 (D.

8

Haw. Aug. 16, 1990) ("There is nothing in the statute which indicates that a debt collector is not required to provide verification where a consumer requests it after paying the debt.").

52. Whether accepting payment, or even holding payment pending verification, is a "further attempt to collect the debt" is an open question in the Seventh Circuit but at least one District Court has held that it is. *Compare Sambor v. Omnia Credit Servs.*, 183 F. Supp. 2d 1234, 1243 (D. Haw. Feb. 5, 2002) ("Because the debt collector in *Bailey* had already collected the debt, there was no collection to 'cease' pending validation. In *Bailey*, keeping the consumer's money was tantamount to continuing collection activity.").

53. The unsophisticated consumer would be confused as to whether she had effectively exercised her validation rights by sending a payment along with a dispute letter.

54. Moreover, the unsophisticated consumer would have no idea how to both seek verification of the debt and preserve the settlement offer in Exhibit A.

55. The consumer needs time to process the information contained in an initial debt collection letter before deciding whether to dispute, pay or take other action. This is the point of the 30 day period in 15 U.S.C. 1692g(a).

56. Prior to deciding whether to dispute a debt, a consumer may have to sort through personal records and/or memories to try to remember if the debt might be legitimate. She may not recognize the creditor – debts are freely assignable and corporations, especially banks, often change names.

57. The § 1692g validation period lasts for 30 days. It is the consumer's right to *request* verification until the end of the thirty day period. If the request is not made until the end of the thirty day period, the verification request would not be processed, researched by the creditor, and returned to the consumer until long after settlement offer payment deadline has

expired. The consumer would be left with no time to review the verification and determine whether to accept the settlement offer.

58. The unsophisticated consumer would have no idea how to both seek verification of the debt and preserve the settlement offers in Exhibit A. It is likely that the settlement offer would expire before the debt collector provides verification. The consumer would be left with little or no time to review the verification and determine whether to accept the settlement offer.

59. The effect of the settlement offer in the initial written debt communication is to discourage or prevent consumers from exercising their validation rights.

60. Defendant did not include explanatory language in Exhibit A, *see, eg. Bartlett*, 128 F.3d 497, 501-02 (7th Cir. 1997).

61. In order to preserve the settlement offer in the event of a written dispute, and to preserve the 30-day validation period itself, any explanatory language should make clear whether a dispute will extend the settlement offer while the debt collector is in the process of complying with its obligation to verify the debt.

62. Plaintiff was confused by Exhibit A.

63. The unsophisticated consumer would be confused by Exhibit A.

64. Plaintiff had to spend time and money investigating Exhibit A and the consequences of any potential responses to Exhibit A.

65. Plaintiff had to take time to obtain and meet with counsel, including traveling to counsel's office by car and its related expenses, including but not limited to the cost of gasoline and mileage, to advise Plaintiff on the consequences of Exhibit A.

66. The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Pogorzelski v. Patenaude & Felix*

10

*APC*, No. 16-C-1330, 2017 U.S. Dist. LEXIS 89678 *9 (E.D. Wis. June 12, 2017) ("A plaintiff who receives misinformation from a debt collector has suffered the type of injury the FDCPA was intended to protect against."); *Spuhler v. State Collection Servs.*, No. 16-CV-1149, 2017 U.S. Dist. LEXIS 177631 (E.D. Wis. Oct. 26, 2017) ("As in Pogorzelski, the Spuhlers' allegations that the debt collection letters sent by State Collection contained false representations of the character, amount, or legal status of a debt in violation of their rights under the FDCPA sufficiently pleads a concrete injury-in-fact for purposes of standing."); *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS 81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *Church v. Accretive Health, Inc.*, No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (11th Cir. July 6, 2016) (same); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v.*

11

*Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

67. Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

68. 15 U.S.C. § 1692e generally prohibits the "use [of] any false, deceptive, or misleading representation or means in connection with the collection of any debt."

69. 15 U.S.C. § 1692e(2)(A) specifically prohibits "the false representation of the character, amount, or legal status of any debt."

70. 15 U.S.C. § 1692e(10) specifically prohibits: "The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

71. 15 U.S.C. § 1692f generally prohibits the "use [of] unfair or unconscionable means to collect or attempt to collect any debt."

72. 15 U.S.C. § 1692g(b) states, in part:

(b) **Disputed debts**
…
Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

## COUNT I – FDCPA

73. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

74. The expiration dates listed for the settlement offers in Exhibit A conflict with and overshadow the debt validation notice, in that Exhibit A does not explain how the debt collector would proceed if the consumer attempted to request verification of the debt and accept the settlement offer if the debt could be verified. 15 U.S.C. § 1692g; *Bartlett*, 128 F.3d at 500.

75. The expiration dates listed for the settlement offers in Exhibit A conflict with and overshadow the debt validation notice, in that the settlement offers require the consumer to tender payment during the validation period or shortly thereafter, but do not explain how the validation notice and settlement "deadline" fit together. 15 U.S.C. § 1692g; *Bartlett*, 128 F.3d at 500.

76. Exhibit A is confusing, deceptive, and/or misleading to the unsophisticated consumer.

77. Defendants violated 15 U.S.C. §§ 1692e, 1692e(10), 1692f and 1692g(b).

## COUNT II – FDCPA

78. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

79. The Option (3) settlement offer in Exhibit A is false, deceptive, misleading, and confusing to the unsophisticated consumer. Option (3) states that the consumer may resolve the debt for $503.49 but provides an installment payment schedule that adds up to payments of only $503.48.

80. The Option (3) settlement offer in <u>Exhibit A</u> is an unconscionable means of collecting the alleged debt because it attempts to induce the consumer to tender payments according to a schedule that will not actually settle the consumer's account.

81. Defendants violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(10), and 1692f.

## CLASS ALLEGATIONS

82. Plaintiffs bring this action on behalf of a Class, consisting of (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by <u>Exhibit A</u> to the complaint in this action, (c) seeking to collect a debt for personal, family or household purposes, (d) between January 3, 2017 and January 3, 2018, inclusive, (e) that was not returned by the postal service.

83. The Class is so numerous that joinder is impracticable. Upon information and belief, there are more than 50 members of the Class.

84. There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the Defendants complied with the FDCPA.

85. Plaintiff's claims are typical of the claims of the Class members. All are based on the same factual and legal theories.

86. Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

87. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

88. Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant for:

(a) actual damages;

(b) statutory damages;

(c) attorneys' fees, litigation expenses and costs of suit; and

(d) such other or further relief as the Court deems proper.

Dated: January 3, 2018

**ADEMI & O'REILLY, LLP**

By: /s/ Mark A. Eldridge
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
Jesse Fruchter (SBN 1097673)
Ben J. Slatky (SBN 1106892)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com
meldridge@ademilaw.com
jfruchter@ademilaw.com
bslatky@ademilaw.com